## GOLDSMITH *v.* ELWERT.

(50 Pac. 867.)

1. ALLEGATIONS AND PROOF—FINDINGS.— A decree must always follow the issues made by the pleadings, and if it is based on irrelevant evidence or on extraneous issues it cannot be upheld: *Bender* v. *Bender,* 14 Or. 353; *Woodward* v. *Oregon Railway and Navigation Company,* 18 Or. 289, and *Knahtla* v. *Oregon Railway and Navigation Company,* 21 Or. 136, approved and applied.

2. TRIAL DE NOVO IN SUPREME COURT.— On appeal to the supreme court in an equity suit, the original testimony will be reviewed, and the court will draw its own conclusions therefrom, rendering such final decree as may be proper.

3. PRESUMPTION— FAILURE TO APPEAL.— A party who does not appeal is considered as accepting the situation; if dissatisfied, an appeal must be taken, either direct or cross: *Shirley* v. *Burch,* 16 Or. 83; *Thornton* v. *Krimbel,* 28 Or. 27; *Cooper* v. *Thomason,* 30 Or. 162, followed.

From Multnomah: LOYAL B. STEARNS, Judge.

This is a suit by P. Goldsmith, S. Oppenheimer, and B. Goldsmith, as partners, under the firm name

of Goldsmith & Loewenberg, against Mrs. J. B. Elwert
and Charles P. Elwert, to foreclose a lien on certain
real property in the City of Portland. The facts are
that on June 17, 1893, plaintiffs entered into a con-
tract with Mrs. Elwert, by the terms of which they
agreed to furnish one No. 23 Boynton hot-water
heater, one galvanized iron tank, twenty-seven radia-
tors, and the necessary piping, constructed in such
a manner as to secure a free and continuous circula-
tion of hot water, and to place the same in a house
built by Mrs. Elwert on said premises, and guarantied
that the radiators placed in the rooms should be capa-
ble of heating the same to 70° Fahrenheit when the
temperature was at zero outside, and, in consideration
thereof, Mrs. Elwert agreed to pay plaintiffs $840,
within thirty days after the completion of the work;
that on October 16, 1893, plaintiffs executed a written
memorandum which specified, as a further condition
of their guaranty, that the fuel to be used in attaining
the guarantied degree of heat should be wood; that
plaintiffs entered upon the performance of their con-
tract, which they claim to have executed in accord-
ance with the terms thereof, and, to secure the pay-
ment of the amount agreed to be paid, filed in the
proper office, within the time prescribed by law, their
claim of lien, and bring this suit to foreclose the
same, alleging that Mrs. Elwert, after the execution of
said contract, had conveyed the premises to the de-
fendant Charles P. Elwert. The defendants, after de-
nying the material allegations of the complaint,
which is in the usual form, allege that plaintiffs, well
knowing that Mrs. Elwert was constructing a building

to be rented and used as a boarding house or family
hotel, agreed to place the heater, pipes, and radiators
therein, guarantying to raise the heat, in each of the
rooms in which a radiator might be placed, to the de-
gree hereinbefore stated, but that the apparatus so
placed in said building would not raise the tempera-
ture in such rooms above 54° Fahrenheit, under the
conditions specified in said contract; that plaintiffs
had been requested to remove the heater, pipes, and
radiators, but had neglected to do so; and that, in
consequence of their failure to keep and perform their
engagements, defendants had sustained a loss, and
been damaged in the sum of $1,450, for which they
prayed a decree.    The allegations of new matter con-
tained in the answer having been denied in the reply,
a trial was had; and from the evidence taken thereat
the court made, inter alia, the following findings:
"That, among other things, it was guarantied by the
said plaintiffs that said house should heat 70° when
the temperature is at zero outside; and the court finds
that there is a great deal of conflict in the testimony
as to whether said apparatus will heat 70° when the
temperature is at zero outside, and finds that it will
not do so.  The court further finds that plaintiffs were
at all times ready and willing to test said apparatus
to ascertain said fact, and at all times offered to, and
were willing to, increase the heating capacity of said
apparatus, and to in every respect cause it to conform
to said guaranty; and that the said defendants refused
to permit said plaintiffs to do so, and refused to per-
mit plaintiffs to make a full and sufficient test of said
heating apparatus, and refused to permit them to in

any way increase the capacity thereof, and refused to permit them to fully and entirely complete their said contract with defendants. They suffered no damages by reason of the said apparatus being in said house, or by reason of any defect therein, and are not entitled to recover any damages herein. That $640 is a reasonable sum to be allowed plaintiffs as payment for the said apparatus as it now sets in said house, for the work, labor, and services performed and material furnished to and upon said house in putting in said apparatus, and $10 is a reasonable sum to be allowed plaintiffs for attorney's fee for foreclosing this lien." The court thereupon decreed that the said lien be foreclosed, and ordered the property sold to satisfy the amounts so found to be due, without awarding costs or disbursements to either party, from which decree defendants appeal.

AFFIRMED.

For appellants there was a brief over the name of *Watson, Beekman & Watson*, with an oral argument by *Messrs. Edward B. Watson* and *Dell Stuart*.

For respondents there was a brief over the names of *Geo. G. Gammans*, and *McGinn, Sears & Simon*, with an oral argument by *Messrs. Henry E. McGinn* and *Nathan D. Simon*.

MR. CHIEF JUSTICE MOORE, after making the foregoing statement, delivered the opinion of the court.

1. It is contended by counsel for defendants that the only issue made by the pleadings is as to whether

the apparatus so furnished by plaintiffs complied with
the terms of their guaranty, and that, the court having
found that it did not, the suit should have been dis-
missed, and hence it was error to find that the defend-
ants refused to permit plaintiffs to perform their en-
gagements, or that the work and labor performed and
materials furnished were of any reasonable value.
The defendant's answer was in the nature of a plea of
avoidance in law, which admitted the execution of the
contract, but denied any liability thereunder by rea-
son of plaintiff's default in failing to supply such ap-
paratus as they had agreed to furnish: 4 Enc. Pl. &
Prac. 666.    The allegations of this plea having been
denied, the chief question to be determined is whether
the temperature could be raised, by the means so fur-
nished, to 70° Fahrenheit when the temperature out-
side was at zero.    The allegations of the respective
parties afford the foundation, and the proof cor-
responding therewith constitutes the superstructure
erected thereon, which, when considered together, will
support the decree; and, under this rule, it has been
held that a decree in a suit must correspond with the
allegations of the pleadings, and that, when it is
predicated upon findings made from evidence which
is not relevant to the issue, the decree cannot be up-
held: *Bender* v. *Bender*, 14 Or. 353 (12 Pac. 713);
*Woodward* v. *Oregon Railway and Navigation Company*,
18 Or. 289 (22 Pac. 1076); *Knahtla* v. *Oregon Short Line
Railway Company*, 21 Or. 136 (27 Pac. 91).    No issue
having been raised on the question of plaintiffs' offer
or defendants' refusal to permit them to make a

proper test of the apparatus, there was error in the court's finding thereon.

2. It is true, the circuit court found that the required temperature could not be obtained by the means furnished; but, the cause being tried here de novo on the evidence submitted in the court below, this court will draw its own conclusions* therefrom.

Reviewing the evidence, the most important fact to be deduced from it is whether the apparatus possesses the requisite capacity to heat the rooms to the extent agreed upon. It is conceded that plaintiffs supplied the heater, tanks, pipes, and radiators according to contract, put them in their proper positions in the house, made the necessary connections, and turned the water into the apparatus, from which there was no leakage, thereby demonstrating, that the joints were water-tight. The plaintiffs called R. McKay as a witness, who testified that he and one B. Singer, a plumber and gas-fitter, who had adjusted the apparatus, tested its capacity by starting a fire in the heater at about eleven o'clock in the forenoon, which they maintained until about five o'clock that evening, at which time they left the building; but, returning the next day, they renewed the fire, and succeeded in raising the temperature, which was about 40° or 45° without, to 74° in the hall and 73° in the dining room; whereupon they sent for defendants' architect to examine the apparatus, with a view to obtaining his approval of the same, but, a carpenter having taken off the front door in the meantime, the temperature had fallen to 54° before he arrived. Several expert wit-

*See *Nessley* v. *Ladd*, 29 Or. 354.—REPORTER.

nesses testified that Haswell's Engineers' and Mechanics' Pocket Book (thirty-first revised and enlarged edition, published in 1875, by Harper & Brothers, Franklin Square, New York) is a standard work upon the several subjects therein treated, and thereupon page 533 thereof was offered in evidence, which reads as follows: "Warming Buildings and Apartments by Low Pressure Steam (one and one-half to two pounds) or Hot Water. One square foot of plate or pipe surface will heat from forty to one hundred cubic feet of inclosed space to 75° in a latitude where the temperature ranges from 10° or 10° below zero. The range from forty to one hundred is to meet the conditions of exposed or corner buildings, of buildings less exposed, as the intermediate ends of a block, and of rooms intermediate between the front and rear. As a general rule, one square foot will heat seventy-five cubic feet of air in outer or front rooms, and one hundred in inner rooms. Plaintiffs' expert witnesses testify that one square foot of radiating surface will heat, on an average, seventy cubic feet of inclosed space in the latitude of Portland, Oregon, where the temperature very rarely falls to zero. The opinion of these witnesses in respect to the capacity of the apparatus in question is, no doubt, influenced to some extent by the fact that defendants' house has no large windows, and being protected by a brick fire wall on one side, and sheltered by a building on another, is not very much exposed to cold weather. One of defendants' expert witnesses, however, says that there is very little difference between a corner and an inside house, for

the reason that no high winds were ever known to prevail in this climate. It is admitted that the boiler placed in defendants' building has a capacity for heating seven hundred square feet of radiating surface, and that, if one square foot of radiation equal seventy cubic feet of inclosed space, it will require not more than six hundred and fifteen and one-third square feet of radiation to heat the house to the required degree, and that plaintiffs placed in the several rooms twenty-seven radiators, aggregating six hundred and fifty-four and one third square feet of radiation. It will thus be seen that, if the ratio existing between the square feet of radiating surface and the cubic feet of inclosed space be correct, the boiler possessed ample capacity, and the radiators afforded a sufficient number of square feet of exposure, to heat the building properly. The important inquiry, therefore, is to ascertain the ratio in question, for upon its proper solution the decision must necessarily hinge.

The only evidence that tends to controvert the ratio assumed is the fact that the temperature in the building was never raised, probably, to the required standard by the means supplied, and the opinion of C. C. Clark, an expert witness, called by defendants, who testifies, in substance, that a No. 23 Boynton heater carries seven hundred feet of radiation, and that the radiation in the house is about six hundred and fifty square feet; that the boiler is large enough for the radiation, but the radiation is not sufficient for the house; that he had not personally examined the apparatus in question, but he was certain that, with less radiation than one square foot to forty feet

of inclosed space, the temperature could not be raised
from zero outside the building to 70° Fahrenheit
within.   This witness, having had much experience
in heating buildings, appears to be thoroughly con-
versant with the subject, and no one can read his
testimony without being impressed with the belief
that his opinion was the result of careful considera-
tion on his part; yet we feel that the ratio so given
by him is overborne by the weight of evidence.   It
is true that other witnesses called by defendants tes-
tify that, in their opinion, the apparatus in question
will not heat the building to the required degree of
temperature, under the conditions imposed;  but they
do not testify concerning this ratio, nor assign any
reason for their opinion, except the general belief
that the heater is too small for the purpose for which
it was furnished.   A. R. Church, a plumber and gas-
fitter, being called as a witness for defendants, says
that he sent a man to test the heater, who maintained
a fire therein for four hours, and that, while the tem-
perature was 76° outside the building, he could obtain
but 72° within the rooms;  that two large circulating
coils in the hall did not get warm, but the rest of
the coils got as hot as was necessary;  and that he did
not touch these two coils, nor intend to do so.   E. J.
Church, who assisted in making this test, being called
as a witness, corroborates A. R. Church, and says that
every radiator in the building got hot except the two
coils in the hall, and that, if the hot water had circu-
lated in them, it would have increased the tempera-
ture throughout the house.   William Stokes, architect
of defendants' building, says that the radiators have

an air valve, which, when unopened, causes an air chamber to be formed, which prevents circulation; that he discovered the water did not circulate, but did not inform the persons who were attempting to test the apparatus of this fact as it was not his place to tell them what was wrong, but it was their duty to know what to do. The deposition of plaintiff B. Goldsmith shows that when the test of the apparatus was made by McKay the house was unfinished and damp, without carpets, furniture, curtains, or shutters, and unoccupied; that carpets, curtains, and shutters tend to exclude the cold, and to retain the heated atmosphere; that when a room is furnished, a quantity of air, equivalent to the number of cubic feet contained in the furniture, is displaced, thereby rendering it unnecessary to heat the space so occupied; that it is customary, and was also contemplated when the contract was entered into with Mrs. Elwert, that the final test would be made, and the maximum degree of temperature obtained, when the house was finished, the walls dry, and the rooms furnished and occupied; and that the time necessary to make a proper test of the heating capacity of the apparatus is from seven to ten days.

It is very evident that the test of the heater made by the defendants' witnesses was very unfair; for knowing that, if the air was permitted to escape from the coils,—which could be easily liberated by opening the valves,—the heated water would circulate in the pipes and radiators, thereby increasing the temperature in the building, they purposely made no effort in that direction. While it does not positively appear

that the temperature in the house was ever raised, by the means provided for that purpose, to the required standard under the conditions agreed upon, and it is very doubtful if that fact can ever be demonstrated, for the reason that the temperature very rarely falls to zero in the latitude of Western Oregon, yet we think the preponderance of the evidence fairly shows that the heater, pipes, and radiators are capable of generating the stipulated degree of heat, under the circumstances recited in the contract; and, such being the case, plaintiffs were entitled to recover the contract price of the apparatus, and to a foreclosure of their lien.

3. The court having found that the reasonable value of the articles so supplied and the work and labor performed in placing them in position was but $640, for which it gave a decree, and plaintiffs having failed to appeal therefrom, any error of the court in that respect must be deemed to have been waived by such failure (*Shirley* v. *Burch*, 16 Or. 83, 8 Am. St. Rep. 273, 18 Pac. 351; *Thornton* v. *Krimbel*, 28 Or. 271, 42 Pac. 995; *Cooper* v. *Thomason*, 30 Or. 162, 45 Pac. 295); and hence it follows that the decree is affirmed.

AFFIRMED.